UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 1:04-CR-193 |
| | ) | |
| vs. | ) | |
| | ) | |
| | ) | |
| DWIGHT DANIEL STOCKWELL | ) | COLLIER/LEE |

REPORT AND RECOMMENDATION

Introduction

Attorney Russell L. Leonard, on behalf of defendant Dwight D. Stockwell ("Stockwell"),

filed a motion to have a psychiatric/psychological evaluation performed pursuant to 18 U.S.C. §§

4241 and 4247 to determine Stockwell's mental competency to stand trial [Doc. No. 20]. At the

March 11, 2005 initial hearing on said motion, Attorney Leonard moved for modification of the

motion to request evaluation of Stockwell pursuant to 18 U.S.C. § 4242 to determine sanity at the

time of the offense. Evaluation was not opposed by the government and the motion for a mental

examination and evaluation was granted [Doc. No. 23]. The motion is before the undersigned

pursuant to 28 U.S.C. § 636(b)(1)(B) to conduct such evidentiary hearings as deemed necessary and

to issue a report and recommendation as to Stockwell's mental competency to stand trial and sanity

at the time of the offense.

Forensic reports prepared by Dr. Ron Nieberding, Ph. D. ("Dr. Nieberding") consisting of

a competency evaluation report concerning Stockwell's current mental status and a criminal

responsibility examination addendum report concerning Stockwell's mental status only at the time

of the alleged offenses have been filed under seal [Doc. No. 27]. A report from Stockwell's expert,

Dr. Alan Lee Solomon ("Dr. Solomon"), dated October 3, 2005, concerning Stockwell and the evaluation conducted by Dr. Nieberding also was received by the Court. The reports of Drs. Nieberding and Solomon were made sealed exhibits to their respective testimony at the hearings.

Pursuant to 18 U.S.C. §§ 4241, 4242, and 4247, competency hearings took place on December 9 and 19, 2005 and January 19, 2006. Present at the December hearings were AUSA Steven S. Neff for the government, Attorney Leonard for Stockwell, Dr. Solomon, and Dr. Nieberding, who participated by telephone and video conference.[1] Subsequent to the December hearings, each party timely submitted a post-hearing brief in response to a request by the Court that the parties address who bears the burden of proof with respect to the issue of competency [Doc. No. 34 and 35].

Subsequent to the December hearings, Attorney Leonard filed a motion to reopen the proof on behalf of Stockwell [Doc. No. 36]. In his motion, Attorney Leonard stated he received a letter from Thressa Mears, Stockwell's mother, on December 27, 2005, which set forth certain information relating to Stockwell's competency. Attorney Leonard requested that the proof be reopened to allow Ms. Mears to testify. There being no objection from the government, Stockwell's motion to reopen the proof [Doc. No. 36] was **GRANTED**. A further competency hearing was held on January 19, 2006 in order to permit Ms. Mears to testify.

Stockwell has been indicted for alleged violations of Title 18 U.S.C. § 922(g)(1), felon in

---

[1] At the outset of the hearing, AUSA Neff indicated that although Dr. Nieberding was participating by telephone, it was the government's preference Dr. Nieberding be permitted to testify either by video teleconference or in person. No objection was made to the government's request concerning Dr. Nieberding's testimony. Consequently, Dr. Solomon was the sole witness to testify at the December 9, 2005 hearing, and the hearing was continued in order to permit Dr. Nieberding to testify on December 19, 2005 by video teleconference.

possession of firearms and ammunition; Title 18 U.S.C. § 922(k) possession of a firearm with the manufacturer's serial number removed, obliterated and altered; Title 26 U.S.C. §§ 5822 and 5861(c), possession of a firearm that was a homemade "booby trap" device; and Title 21 U.S.C. §§ 841(a)(1) and (b)(1)(C), 846 and 843(a)(6), attempting to manufacture methamphetamine and possession of equipment, chemicals, products and materials which may be used to manufacture methamphetamine [Doc. No. 1].

<u>Evidence</u>

I have considered the reports and testimony of both Dr. Solomon and Dr. Nieberding. Each had the benefit of reviewing the report(s) of the other and hearing the other's testimony, but the conclusions of the two are in conflict. Dr. Nieberding opines Stockwell is competent to assist counsel in his defense, does not suffer from a severe mental disease or defect under the law making him unable to understand the proceedings or properly assist in his defense, and his mental state at the time of the offense does not support an insanity defense. In direct contrast, Dr. Solomon opines Stockwell is not fully competent to properly assist counsel in his defense.

1.      *Dr. Solomon's Opinion*

Dr. Solomon is a physician with a speciality in psychiatry. He did his residency in psychiatry at Vanderbilt University Hospital in Nashville, Tennessee, and has been in private practice for approximately 20 years.

Dr. Solomon's testimony essentially mirrors his written report. Dr. Solomon testified he first began treating Stockwell in April 2003. He began seeing Stockwell at the request of Stockwell's mother because Stockwell reportedly was experiencing significant mood swings and fatigue following a motor vehicle accident in which Stockwell received a closed head injury. Dr. Solomon

3

saw Stockwell on five or six occasions from April 2003 to October 2003 for a total of around four hours of direct interaction. Dr. Solomon reports he continued to treat Stockwell "off and on" until February 2004, when he met with Stockwell's mother to discuss Stockwell's situation at a time when Stockwell had discontinued his medications.

During his treatment of Stockwell, Dr. Solomon's opinion was that Stockwell was developing mood instability with significant memory difficulty due to his head injury . He also found Stockwell to have an alcohol abuse problem. Dr. Solomon found Stockwell was status post-head injury; namely, Stockwell had right parietal lobe injury and subdural hematoma. Dr. Solomon stated the subdural hematoma would have resulted in pressure on the brain. Stockwell complained of quite rapid changes in mood, fatigue, and difficulties with memory which would come and go. Dr. Solomon stated Stockwell described variations in mood ranging from rage to being too happy or depressed. Dr. Solomon stated Stockwell's family reported Stockwell was experiencing rage and at times he was withdrawn, while at other times he was much happier. Dr. Solomon testified Stockwell also reported his thinking and speech slowed down during the periods when he was experiencing depression.

Dr. Solomon also found Stockwell was experiencing short term memory deficit. He stated this finding was not unusual because Stockwell had experienced a closed head injury and coma as the result of the motor vehicle accident. Dr. Solomon stated such memory deficits are generally quite variable, with significant memory problems on some days and good memory on other days. Based upon Stockwell's head injuries, he could have either temporal lobe or frontal lobe problems, but Dr. Solomon found Stockwell's presentation was more consistent with temporal lobe involvement. When asked whether Stockwell's condition would continue to improve, Dr. Solomon

4

stated typically there was hope for healing and improvement during the first 12 to 18 months following a closed head injury.

Dr. Solomon also testified Stockwell never told him he was using methamphetamine. According to Dr. Solomon, the result of methamphetamine use can be a psychotic disorder – either temporary or permanent. Dr. Solomon stated Stockwell's statement to Dr. Nieberding that he was experiencing auditory hallucinations could have been due to either methamphetamine use or a mood disorder. Dr. Solomon testified long-term use of methamphetamine would exaggerate Stockwell's symptoms. When Stockwell took prescribed mediation, Dr. Solomon saw moderate to significant improvement in Stockwell's symptoms, which would not have resulted if methamphetamine use was the cause of the symptoms.

Dr. Solomon testified Dr. Nieberding's evaluation of Stockwell was well done, although he stated more testing, particularly neuropsychological testing, should have been performed. However, Dr. Solomon disagrees with Dr. Nieberding's conclusion that Stockwell is malingering. Dr. Solomon stated the inconsistency in Stockwell's responses and testing is consistent with the mood and memory problems Stockwell presented to Dr. Solomon in 2003, not with malingering as opined by Dr. Nieberding.

Dr. Solomon developed an opinion about Stockwell's present competency to stand trial based upon his observations of Stockwell from April 2003 to October 2003 (*i.e.*, prior to the arrest), the reports he has received from Stockwell's family, and Stockwell's letters to his family from February 2005 to June 2005 (*i.e.*, since the arrest). Dr. Solomon opines Stockwell has consistently experienced mood swings and hallucinations. Dr. Solomon reports the primary problem affecting Stockwell's competency to stand trial relates back to his head injuries and 11 day coma. Dr.

Solomon opines the consistency of Stockwell's symptoms and problems between the time he was last seen by Dr. Solomon in October 2004 and the time of Dr. Nieberding's evaluation shows Stockwell is not malingering. Dr. Solomon testified individuals who are malingering generally complain their subjective symptoms are worsening, and he noted Stockwell has not made such a claim.

Dr. Solomon opines Stockwell is not competent to stand trial because memory and mood problems will prevent Stockwell from assisting his attorney. Dr. Solomon testified Stockwell's variability in mood will affect his decisionmaking and Stockwell's variability in memory will affect his ability to provide counsel with an accurate history.

Dr. Solomon recommended Stockwell be provided with better evaluation and treatment. He stated Dr. Nieberding's evaluation was not complete because it did not include a neuropsychological evaluation, which would give a better understanding of Stockwell's deficits. Dr. Solomon also states Stockwell should be provided treatment and medication to alleviate his symptoms and prevent unnecessary suffering. Dr. Solomon opines treatment has the potential to make Stockwell competent and to decrease his suffering.

On cross-examination and in his report, Dr. Solomon acknowledged he had not personally seen Stockwell since October 28, 2003. Dr. Solomon also agreed that the more recent the interaction of a psychologist or psychiatrist, the better their evaluation of current mental status would be.

Dr. Solomon did not do any objective testing on Stockwell. He stated when he saw Stockwell for treatment, Stockwell's symptoms and the source of those symptoms (*i.e.*, the automobile accident) were obvious. Dr. Solomon stated Stockwell told him he had a history of alcohol abuse, but Stockwell did not mention methamphetamine use to Dr. Solomon. Stockwell also

did not tell Dr. Solomon he had experienced episodes of memory loss prior to the accident, as was reported to Dr. Nieberding by Stockwell. However, Dr. Solomon does not believe Stockwell was misleading him when they met in 2003. Instead, Dr. Solomon indicates Stockwell was telling the truth about his subjective complaints as well as being an accurate historian when seeking treatment in 2003.

Dr. Solomon distinguished Stockwell's mood swings from the type of mood swings experienced by an average person. He stated Stockwell's mood swings were more serious than those experienced by the average person because Stockwell has clinically significant depression which affects his judgment and ability to make decisions. Dr. Solomon opines Stockwell's mood swings will affect: (1) the speed of his thoughts; (2) his ability to focus; (3) his understanding of what he hears – he may misperceive information; and (4) his ability to make good judgments.

Based upon a review of Dr. Nieberding's report, Dr. Solomon testified Stockwell's symptoms have not changed since Dr. Solomon saw Stockwell in 2003. Dr. Solomon testified his findings were generally substantiatiated by Dr. Nieberding's reports, which indicate variability in Stockwell's mood and his ability to recall and function. Contrary to Dr. Nieberding's findings, Dr. Solomon does not believe Stockwell is malingering, and Dr. Solomon testified that while Stockwell was being seen by him, Stockwell had no reason to malinger for secondary gain.

After Dr. Nieberding's testimony, which is discussed below, Dr. Solomon was recalled to the stand. Dr. Solomon testified his major concern with Dr. Nieberding's opinion is the focus on Stockwell's memory. With respect to Stockwell's ability to properly assist with a defense, Dr. Solomon said he was not as concerned with Stockwell's memory issues as he was with Stockwell's mood issues. Dr. Solomon testified the variable mood issues will impact Stockwell's ability to assist

with the defense of his case more than Stockwell's variable memory because Stockwell's moods may affect his decisionmaking skills. He believes extra time and/or breaks in the trial will not address the potential impact of Stockwell's moods at trial because the moods may last for days. Dr. Solomon acknowledged he did not specifically assess Stockwell's competency to stand trial during the time he treated Stockwell.

2.      *Dr. Nieberding's Opinions*

Dr. Nieberding is a clinical psychologist on staff at the Metropolitan Correctional Center ("MCC") in Chicago, Illinois, where defendant was evaluated at the request of the Court [*see* Doc. No. 23]. Dr. Nieberding has worked with the Bureau of Prisons for 11 years and has handled some 90 mental examinations and evaluations during that time. He has a doctoral degree from the University of North Texas in psychology. He has experience working with persons who have suffered closed head injuries via assessment, but not treatment.

Dr. Nieberding conducted the psychological assessment of Stockwell and prepared the written forensic reports concerning Stockwell. Dr. Nieberding reports that to form his opinions he engaged in an extensive review of the information provided, personally interviewed Stockwell for about five hours over the evaluation time period of about three months, and was involved in the extensive testing of Stockwell. Dr. Nieberding's testimony essentially mirrors his written report.

With respect to Stockwell's personal history, Dr. Nieberding noted Stockwell's early history of conflict with his stepfather, which later improved. He also mentioned Stockwell is a high school dropout with a GED, and has a sporadic work history. Also noted were the suicide of Stockwell's wife, and the ensuing custody battle with the parents of his deceased wife. When Dr. Nieberding interviewed Stockwell, Stockwell had no trouble recalling events from his childhood.

8

The most significant medical history of Stockwell relates to the motor vehicle accident in January 2003. It is undisputed Stockwell sustained multiple broken bones, head injuries and was in a coma for 11 days. Stockwell's head injury was principally to the part of the brain involved in non-verbal tasks. Dr. Nieberding agreed that because the right lobe of the brain sustained the most injury does not mean the left lobe of the brain was unaffected. Dr. Nieberding also noted Stockwell's psychiatric history involved a relatively short period of treatment and medication by Dr. Solomon. Dr. Nieberding also described Stockwell's history of substance abuse beginning at age 15. Stockwell reported an almost daily abuse of alcohol and/or methamphetamine from 1997 until the day of his arrest. Stockwell's legal history includes a number of arrests and convictions resulting from his alcohol abuse.

Stockwell arrived at MCC on March 23, 2005, and remained there for about three months for behavioral observation and testing. During the time he was at MCC, Stockwell did not commit any rule violations. He completed the evaluations without difficultly and had no difficulty understanding the concepts of confidentiality concerning the evaluation. Dr. Nieberding reports the tests utilized in order to evaluate Stockwell are the most widely used tests for evaluations of the nature performed on Stockwell.

As stated in more detail in Dr. Nieberding's report, Stockwell was responsive to examiner questions, but the content of his answers was typically vague. As Stockwell became more comfortable with the examination process, he "opened up" more. Throughout the evaluation, Stockwell was oriented. He was cooperative with Dr. Nieberding, but more animated with the psychology extern who assisted Dr. Nieberding in data gathering. Dr. Nieberding testified such different types of interaction are not unusual and perhaps relate to Stockwell's view of Dr.

9

Nieberding as more of an authority figure than the extern.

Dr. Nieberding found Stockwell to have a relatively wide array of affect, which ranged from sadness to laughing and joking. In all of these moods, however, Dr. Nieberding concluded Stockwell had no problem with the clarity of his thinking. Stockwell expressed his thoughts clearly, but complained about auditory hallucinations, which Stockwell said began after his car accident. Stockwell reported memory loss beginning around the age of 16 (*i.e.,* prior to the car accident) and mood swings. Dr. Nieberding noted Stockwell did not reveal to Dr. Solomon that he had experienced memory loss beginning at age 16. Dr. Nieberding also stated such memory loss may be a symptom of Stockwell's substance abuse. Dr. Nieberding found Stockwell was able to recall specific information regarding events, but at times provided conflicting accounts of the details of the events.

With respect to Stockwell's cognitive assessment, test results show Stockwell has an average IQ. Dr. Nieberding testified a defendant's verbal IQ is more significant when assessing competency to stand trial, and Stockwell's verbal IQ is above average. The results of Stockwell's Wechsler Adult Intelligence Scale-III test, which is designed to assess an individual's cognitive function, support Dr. Nieberding's conclusion that Stockwell should not experience any significant difficulty comprehending information and concepts related to the process of criminal adjudication.

Dr. Nieberding noted memory is not a global concept and verbal memory is just one type of verbal skill. Dr. Nieberding found Stockwell's performance on a task of short term auditory memory fell within the average range. Dr. Nieberding concluded that on tests where Stockwell did not know his memory was being tested, his performance was average. On tests where Stockwell was informed his memory was being tested, such as the Wechsler Memory Scale test, Stockwell's test

10

results fell within the extremely low range. Dr. Nieberding testified Stockwell's "on-again, off-again" memory may be explained by Stockwell's malingering. Dr. Nieberding testified there is not one pattern of malingering, but he agreed Stockwell did not have a pattern of sustained malingering. Dr. Nieberding also noted daily use of methamphetamine would not enhance Stockwell's memory. He noted that in the controlled environment of incarceration, such substance abuse should not occur.

The results of testing indicated to Dr. Nieberding that Stockwell was not giving his best effort on certain tests. For example, on the Test of Memory Malingering ("TOMM"), which does not test memory but does test malingering, Stockwell's scores were lower than would have been predicted by pure chance or guessing. This TOMM result is highly suggestive of malingering according to Dr. Nieberding. The Validity Indicator Profile ("VIP") test also produced inconsistent responses from Stockwell. While the VIP test results may be due to a number of reasons, Dr. Nieberding reports the most likely explanation for the inconsistent results is a lack of sustained effort by Stockwell. Dr. Nieberding also reports a personality assessment indicated Stockwell exaggerated his psychiatric symptoms.

During the evaluation process, dramatic mood swings were not noted. Dr. Nieberding found Stockwell's moods to be consistent with his unfortunate circumstances. While Dr. Nieberding found Stockwell does have legitimate mood issues, he also found Stockwell was exaggerating the number and severity of his moods.

Dr. Nieberding's diagnostic impressions are Stockwell's long-term methamphetamine dependence may have affected his emotional state and moods, which affect should be lessened in the controlled environment of incarceration. In addition, Dr. Nieberding's diagnostic impressions are Stockwell has an adjustment disorder with depressed mood, but Stockwell is also malingering

11

and exaggerating his symptoms to achieve some secondary gain.

Stockwell was administered the Evaluation of Competency to stand Trial-Revised, a routinely used instrument designed to assist in the assessment of competency to stand trial. Dr. Nieberding opined that, in spite of his diagnoses, Stockwell possesses a fundamental factual and rational understanding of the legal system and processes of adjudication. Dr. Nieberding's further opined Stockwell is capable of engaging in productive communication with his attorney and can properly assist in his defense. Dr. Nieberding concluded Stockwell appears to posses a fundamental, factual and rational understanding of his legal circumstances, and an ability to assist his attorney in spite of the symptoms he experiences as a result of the diagnosed problems.

With respect to Dr. Solomon's conclusions, Dr. Nieberding stated Dr. Solomon failed to specifically address the issue of verbal memory versus other types of memory. Dr. Nieberding agreed Stockwell has some legitimate problems as found by Dr. Solomon, but stated Stockwell has exaggerated the severity of those problems. Dr. Nieberding also questioned Dr. Solomon's assessment of Stockwell's ability to assist in his defense since Dr. Solomon has not seen Stockwell since October 2003.

3. *Testimony of Ms. Mears*

Stockwell's mother, Thressa Ann Mears, was the sole witness at the January 19, 2006 hearing. Ms. Mears testified that as the result of Stockwell's automobile accident on January 20, 2003, he was in a coma for approximately eleven days, was semi-comatose for about four weeks, and hospitalized for about seven weeks. A letter written by Ms. Mears to Stockwell's attorney explaining her view of Stockwell's injuries was submitted into evidence as defendant's Exhibit 3 [Doc. No. 39].

Ms. Mears testified Stockwell has experienced seizures, tremors, confusion, mood swings, lack of reasoning and judgment, and enhanced hearing and smelling abilities as the result of his brain injury. This enhanced hearing causes Stockwell some problems with handling noise. Stockwell also experiences problems with making decisions. Ms. Mears said one example of Stockwell's inability to make decisions was his failure to make the arrangements for his wife's funeral. Ms. Mears does not believe Stockwell understands he has problems with his ability to reason. According to Ms. Mears, Stockwell also has significant memory problems, including forgetting things he communicates and denying he had been to Chicago for his evaluation. Ms. Mears also stated Stockwell has been antisocial since the time of his accident and coma and recently has reported experiencing vision problems.

Ms. Mears stated Stockwell is quite articulate in his speech and writing. She introduced as Defendant's Collective Exhibit 2 some letters and poems which Stockwell has written since his arrest. Ms. Mears characterized the poems as ranging from humble to aggressive, with at least one poem concerning his wife's death. These writing also reflect Stockwell's reports to his mother about his failure to remember and his hearing voices like a "radio" in his head.

Ms. Mears stated she is concerned for Stockwell's mental and physical well-being and she does not believe he is capable of helping his counsel during trial on a sustained day-to-day basis. Ms. Mears testified she based her conclusions about Stockwell's competency, in part, upon her experience in private nursing. She has worked in private nursing as a Resident Care Assistant for approximately four years. She does not have a nursing degree or any other type of bachelor's degree in the health field.

According to Ms. Mears, prior to the time of her son's arrest, he lived with his wife and

children until his wife died, and then he lived alone. Ms. Mears was the driving force in the pre-arrest efforts to get Stockwell medical and psychological/psychiatric treatment for the injuries he sustained during his accident. On a number of occasions she made appointments for medical or psychological/psychiatric treatment for her son, but he often refused or failed to keep the appointments.

Ms. Mears finds it hard to believe he son was using methamphetamine. She could not explain her son's statements to Dr. Nieberding that he experienced problems with memory loss prior to the time of his accident/brain injury, because she was unaware of such memory losses prior to the accident. Because she was not aware of such incidents of memory loss or methamphetamine use, Ms. Mears believes her son's reported pre-accident memory losses and/or reports of daily methamphetamine use to Dr. Nieberding may be the result of some sort of planted "suggestion."

Ms. Mears admitted she is unfamiliar with the evaluation process used at MCC. In particular, she does not know if the staff at MCC, not just Dr. Nieberding, were involved in observing and evaluating Stockwell's competency.

<u>Analysis</u>

*Burden of Proof on Competency Issues*

The Court requested that the parties address the issue of who bears the burden of proof to establish competency to stand trial. In response, the government's brief asserts the burden lies with the defendant. To support its position, the government relies upon *Byrd v. United States*, 19 F.3d 18, 1994 WL 84743 (6th Cir. Mar. 11, 1994), an unpublished decision in which the United States Court of Appeals for the Sixth Circuit ("Sixth Circuit") stated "Byrd cannot prevail . . . . because he has not met his burden of proof that he was not mentally competent to stand trial or, in his case,

to plead guilty." *Id.*, 1994 WL 84743 at *1. Based upon this comment, which was made without any analysis of who bears the burden of proof by the Sixth Circuit, the government argues the court in *Byrd* "seems to suggest that it was the defendant, not the government, who possessed the burden to show that he was incompetent." [Doc. No. 34 at 3].

Stockwell asserts the issue of who bears the burden of proof is unclear and the Sixth Circuit has not directly addressed the issue [Doc. No. 35 at 2-3]. However, Stockwell argues the government bears the burden of establishing a defendant's competency to stand trial [*id.* at 3].

The statute dealing with competency to stand trial, 18 U.S.C. § 4241, "do[es] not indicate who bears the burden of proof in a federal competency proceeding." *United States v. Riggin*, 732 F. Supp. 958, 963 (S.D. Ind. 1990). In *Cooper v. Oklahoma*, 517 U.S. 348 (1996), the United States Supreme Court commented on a State's heightened standard of proof stating:

> Only 4 of the 50 States presently require the criminal defendant to prove his incompetence by clear and convincing evidence. None of the remaining 46 jurisdictions imposes such a heavy burden on the defendant. Indeed, a number of States place no burden on the defendant at all, but rather require the prosecutor to prove the defendant's competence to stand trial once a question about competency has been credibly raised. The situation is no different in federal court. Congress has directed that the accused in a federal prosecution must prove incompetence by a preponderance of the evidence. 18 U.S.C. § 4241.

*Id.* at 361-62. The language used by the Supreme Court appears to be *dicta* as the interpretation of 18 U.S.C. § 4241 was not at issue in that case. Several courts have, nonetheless, cited the language in *Cooper,* with little or no analysis, to hold a defendant must prove he lacks the mental competency to stand trial by a preponderance of the evidence. *United States v. Robinson*, 404 F.3d 850, 856 (4th Cir. 2005), *cert. denied*, 126 S. Ct. 288 and 126 S. Ct. 469 (2005); *United States v. Sandoval*, 365 F. Supp. 2d 319 (E.D.N.Y. 2005); *United States v. Rudisill*, 43 F. Supp. 2d 1, 3 (D.D.C. 1999).

15

The majority of cases on the issue, however, holds the government bears the burden of proving by a preponderance of the evidence that a defendant is competent to stand trial. *United States v. Velasquez*, 885 F.2d 1076, 1089 (3rd Cir. 1989), *cert. denied*, 494 U.S. 1017 (1990); *Brown v. Warden, Great Meadow Correctional Facility*, 682 F.2d 348, 353 (2d Cir. 1982), *cert. denied*, 459 U.S. 991 (1982); *United States v. O'Kennard*, 2004 WL 1179391, * 6 (N.D. Ill. May 27, 2004); *United States v. Cole*, 339 F. Supp. 2d 760, 762-63 (E.D. La. 2004); *United States v. Belgarde*, 285 F. Supp. 2d 1218, 1220-21 (D.N.D. 2003); *United States v. Mason*, 935 F. Supp. 745, 759-60 (W.D.N.C. 1996), *aff'd*, 121 F.3d 701 (4th Cir. 1997); *United States v. Kokoski*, 865 F. Supp. 325, 329 (S.D.W.Va. 1994), *aff'd*, 82 F.3d 411 (4th Cir. 1996), *cert. denied*, 519 U.S. 892 (1996). *See also Riggin*, 732 F. Supp. at 963 ("on principles of fundamental fairness and due process, courts have appropriately refused to place the burden of proving incompetency on the defendant") (citing *United States v. DiGilio*, 538 F.2d 972 (3rd Cir. 1976), *cert. denied*, 429 U.S. 1038 (1977)).

The court in *Riggin*, also noted when Congress so desired, it had no problem setting forth a clear assignment of the burden of proof to the defendant concerning the defense of insanity. *Riggin*, 732 F. Supp. at 963. *See, i.e,* 18 U.S.C. § 17(b) ("The defendant has the burden of proving the defense of insanity by clear and convincing evidence."). No such clear assignment of the burden of proof appears in 18 U.S.C. § 4241.

Thus, I conclude the government has the burden of proving a defendant is competent to stand trial by a preponderance of the evidence. As stated, in *Medina v. California*, 505 U.S. 437 (1992), "the allocation of the burden of proof to the defendant will affect competency determinations only in a narrow class of cases where the evidence is in equipoise; that is, where the evidence that a defendant is competent is just as strong as the evidence that he is incompetent." *Id.* at 449 (citing

16

*DiGilio*, 538 F.2d at 988).  As will be discussed more fully below, the evidence concerning Stockwell's competency is not in equipoise.  Thus, although I have concluded the government bears the burden of proving Stockwell is competent to stand trial by a preponderance of the evidence, the assignment of the burden to the government is not as crucial or essential in the outcome as it might be in other situations.

*Standard for Mental Competency*

The standard for determining mental competency to stand trial is whether the defendant has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding - and whether he has a rational as well as a factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402 (1960) (per curiam); *United States v. Branham*, 97 F.3d 835, 855 (6th Cir. 1996).  The Court must determine whether "there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a).

*Application to Stockwell*

In making a recommendation in this case, I have considered the testimony of Ms. Mears, the experts, and the expert reports.  The experts' opinions are consistent in many of their findings.  The crux of the difference in the experts' opinions is whether Stockwell's mood and memory problems will render him unable to properly assist in his defense.  Dr. Solomon concludes Stockwell's mood and memory symptoms are real and present a significant barrier to Stockwell's ability to assist counsel, while Dr. Nieberding concludes the symptoms are exaggerated and Stockwell is capable of engaging in productive communication with his counsel to properly assist in his defense.

17

I find Stockwell "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and a "rational as well as factual understanding of proceeding against him." *See Dusky*, 362 U.S. at 402. I find no reasonable cause to believe Stockwell is suffering from a mental disease or defect which sufficiently impairs his ability "to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a).

I conclude Dr. Nieberding's opinion is more persuasive on the question of Stockwell's present competency to stand trial than is Dr. Solomon's opinion. Under the direction of Dr. Nieberding, Stockwell went through an extensive evaluation designed exclusively to determine his competency to stand trial. Based on test results, it appears Stockwell exaggerated his symptoms. For instance, Stockwell scored below chance on the TOMM indicating malingering, and Stockwell performed worse in the area of memory skills when he was advised a test was designed to test memory.

Although Dr. Nieberding had about the same amount of personal interview time with Stockwell as Dr. Solomon, Dr. Nieberding and his staff were able to personally observe and interview Stockwell on a regular and recent basis. During the nearly three months Dr. Nieberding and his staff recently observed Stockwell, they reported no *significant* mood swings or severe memory deficits. While it is undisputed Stockwell has psychological problems, I conclude none of them is significant enough to interfere with his ability to assist in his defense, especially in light of evidence demonstrating Stockwell is malingering and exaggerating the severity of his difficulties.

Dr. Solomon's report, analysis, and testimony concerning Stockwell's *present* ability to assist counsel is of limited use because Dr. Solomon has not seen Stockwell for more than two years.

18

Dr. Solomon saw Stockwell a limited number of times more than two years ago for purposes of treatment, not for evaluation of his mental competency to stand trial. Dr. Nieberding's evaluation is of more use because it is based on more recent and comprehensive observations and interactions designed specifically to assess competency.

Dr. Solomon's attempt to update his evaluation is dependent upon Dr. Nieberding's evaluation, the reliability of information Stockwell provided in the past to Dr. Solomon, the reliability of information Stockwell provided in letters to his mother, and the reliability of information Stockwell's family provided about Stockwell's symptoms. Yet, Stockwell never reported to Dr. Solomon or his mother he was a methamphetamine addict who used at least a quarter gram of methamphetamine per day over many years. Such an omission is significant because Dr. Solomon analyzed Stockwell's problems more in terms of a physical brain injury than in terms of a methamphetamine abuse problem. Likewise, Stockwell did not tell Dr. Solomon or his mother about his pre-accident memory lapses. Under these circumstances, it appears Stockwell did not provide accurate or complete information to Dr. Solomon or his mother. Stockwell's lack of candor when seeking treatment with Dr. Solomon in 2003 certainly calls into question the conclusions drawn by Dr. Solomon based on information provided by Stockwell and his family regarding the severity of Stockwell's problems.

In considering the testimony of Ms. Mears, I find she is a compassionate, concerned, and caring mother. However, I do not find her testimony is a basis for finding Stockwell is not competent to stand trial. Although Ms. Mears opined Stockwell is not competent to stand trial, she has no medical or nursing credentials. Thus, I find her testimony about Stockwell's competency is entitled to less weight than either Dr. Nieberding's or Dr. Solomon's opinions. Further, Ms. Mears'

primary interaction with her son was during the period between his accident/brain injury on January 20, 2003 and the time of his arrest. She had a limited awareness of Stockwell's current condition. When asked about Stockwell's statements to Dr. Nieberding about methamphetamine use or memory lapses prior to his accident/brain injury, Ms. Mears either minimized such reports, by suggesting Stockwell's statements were a response to a "suggestion" planted by unknown persons, or stated she was unfamiliar with any memory lapses.

In addition, Ms. Mears' testimony about an inability to assist counsel focused on Stockwell's memory problems. However, even Dr. Solomon, Stockwell's psychiatric expert, stated his primary concern with respect to the assistance of counsel in the defense was how Stockwell's mood, not his alleged memory lapses, might affect his competency. Finally, it is clear Stockwell hid from his mother certain aspects of his behavior, such as his methamphetamine usage, and it is certainly plausible he continues to be less than candid with her about his condition. Thus, although I have no doubt that Ms. Mears is genuinely concerned for her son, I find her testimony, either standing alone or when considered in conjunction with the reports and testimony of Drs. Nieberding and Solomon, is not sufficient to overcome the government's proof that Stockwell is competent to stand trial.

For the reasons set forth in detail above, I conclude the government has met its burden of proving Stockwell is competent to stand trial.

<u>Conclusion</u>

Having carefully reviewed the pleadings and the experts' opinions, I **RECOMMEND**[2] the

Court find Stockwell is able to understand the nature and consequences of the proceedings against

him, is able to assist in his defense, and therefore is competent to stand trial.

s/*Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[2] Any objections to this Report and Recommendation must be served and filed within ten
(10) days after service of a copy of this recommended disposition on the objecting party. Such
objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure.
Failure to file objections within the time specified waives the right to appeal the District Court's
order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7, 106 S. Ct. 466, 472 n.7, 88 L. Ed. 2d 435 (1985). The
district court need not provide de novo review where objections to this Report and Recommendation
are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only
specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d
1370, 1373 (6th Cir. 1987).